# Yard *versus* Patton.

A being liable on certain notes given for the accommodation of B, executed a bond and mortgage to C, which it was declared was in trust to secure the payment of those notes by instalments, as they were from time to time renewed. A few days afterwards A and B executed a deed whereby B agreed to pay the notes and the renewals according to the agreement between A and C, in consideration of which A agreed that after the notes were paid, B should have the mortgage to his own use. This agreement being under seal, is irrevocable by A and requires no consideration to support it.

Nor is it rescinded by a partial failure of B to perform his stipulation to pay the notes, for the injury can be exactly ascertained, and is thus capable of compensation.

Appeal from Nisi Prius in Equity, *Philadelphia:*

March 6th.—The bill filed by Yard, executor of Elliott, set forth that Elliott, on the 30th June, 1837, executed a mortgage to Patton, to secure a bond for $13469 : but that in fact it was given to secure Elliott's notes given for the accommodation of D. Cragg, as appeared by an instrument of the same date, executed by Patton. That on the 12th July, 1837, Cragg and Elliott sealed an agreement whereby the former undertook to pay these notes and the discounts on renewals, agreeably to the terms of the agreement between Elliott and Patton, in consideration whereof Elliott agreed after such payment and performance, Cragg should have the mortgage for his own use as his absolute property. That on

the 30th November, 1838, Elliott gave Patton notice not to make any transfer of the mortgage to Cragg, or any other person, the same being void for want of consideration. On the 15th February Elliott died, and by his will directed his executors to resist compliance with the agreement, the same being void for want of consideration, and unfairly obtained. That Cragg had not complied with his agreement and had not paid part of the notes which the executors of Elliott were obliged to pay. And though all the debts to secure which this mortgage was given had been paid, yet the incumbrance remained upon record to the great embarrassment of the executors, the personalty proving insufficient for the payment of debts. But that D. Cragg and R. Cragg, the executrix of his assignee of the mortgage, set up a claim to the mortgage.— The bill then prayed a cancellation of the agreement and that satisfaction should be entered on the mortgage.

Patton by his answer admitted that the trust for payment of the notes was satisfied, and that he had no interest.

R. Cragg by her answer denied that the notes were accommodation notes. She alleged that D. Cragg had married the only daughter of Elliott, who had advanced to him $10,000 in notes, as capital to carry on his business in consideration of the relationship. When apprehensive that Cragg would not be able to meet these notes in time to. save Elliott's property from sacrifice, Elliot had entered into the arrangement with Patton and with Cragg, which was delayed until Elliott was perfectly satisfied with the mode of accomplishing his object, and that it was his intention to carry out his original design of advancing capital to Cragg, but to postpone the payment until the notes were taken up by him.— That she was prepared to prove when facts were alledged, rendering it necessary for her to do so, that there was no fraud, concealment, or misrepresentation. She alleged that the sealing imported a sufficient consideration, which in fact existed, and that Elliott could not repudiate his contract after allowing Cragg to expend his money on the faith of it. That Cragg had performed his agreement as to the notes until the sickness of Elliott prevented him giving a note for renewal, by which a further renewal was impossible. She further set up the assignment by D. Cragg to her testator.

The agreement between Patton and Elliott, of the 30th June, declared that the bond and mortgage were given to secure the payment of certain notes given for the accommodation of D. Cragg, and held by various persons and corporations of which Elliott agreed to pay ten per cent., the discount on the notes given on renewal every ninety days until all were paid.

The deed between Elliott and Cragg, of the 12th of July, recited the agreement between Patton and Elliott; Cragg thereby agreed to pay the ten per cent. and discount until all those notes

[Yard *v.* Patton.]

were fully paid, and to indemnify Elliott from all liability and loss therefor; in consideration whereof Elliott agreed that after the same was performed, Cragg "shall have and take the bond and mortgage for his own use and benefit, and that in payment of said notes and performance of his agreement in manner aforesaid, the same may be assigned by the said Patton or his representatives to the said Cragg or his assigns, as his or their absolute property, and the estate of the said Elliott shall be and remain chargeable with the payment of the same in the same manner as if the said bond had been given unconditionally."

The will of Elliott was shewn to contain the allegation set forth in the bill. It was also proved that the notes were fully paid in part, by Elliott or his executors, and that his personal estate was insufficient to meet his debts. It was also shewn that Elliott and D. Cragg were not on good terms with each other.

The defendant proved repeated efforts by Cragg to obtain Elliott's signature to notes for renewals which were unsuccessful, his reason assigned being that he would thus prevent the mortgage passing to Cragg. It was also shewn that Elliott had left considerable real estate. The defendant also read in evidence the correspondence between Elliott and the counsel of Cragg, in reference to the allegation of fraud in obtaining the agreement.

On the 3d July, the counsel wrote to Elliott, after referring to the bond and mortgage: "Mr. Cragg is, I understand from you and them, to make his exertions to take up the notes and pay the instalments, and if he should be able to effect that object then he is to have the benefit of the mortgage now given by you for his own use, which in that case is to be assigned to him. * * This will require an agreement to be drawn in which the understanding can be explicitly defined. That is, Cragg to pay the notes as they become due, and to have the mortgage assigned to him for his own use in doing so."

On the 5th, Elliott wrote the counsel in answer, directing an agreement to be drawn; in the reply the counsel said: "I wanted to know if Mr. Cragg was to have the benefit of the mortgage, if he pays the ten per cent. reduction, and this note does not inform me distinctly. If that is your wish, then I shall know how to draw the agreement." The reply of Elliott was: "I wish you to draw up the article according to the ideas conveyed in your note of the 3d inst." These notes from Elliott were written by his clerk but signed by him.

The court dismissed the bill.

*Budd,* for the appellant.—By the payment of the notes to secure which the mortgage was given it became extinct and cannot be revived even were the present claimant surety: *Stor. Eq.* sec. 499, *b. c. d.; 5 W. & S.* 352; *5 Barr* 78. The agreement between

[Yard *v.* Patton.]

Elliott and Cragg does not bind him as a declaration of trust, because he was not a party, and its effect as an appointment is annulled by the revocation in the notice of June 30, 1837, and by the declaration in the will. The time between the dates of the two agreements is too great to allow an argument that they were but one transaction, and hence, although the mortgage is ineffectual, the complainant is entitled to have the cloud removed from his title: *Stor. Eq.* sec. 705.

The agreement was without consideration; for it recites that the notes were for the accommodation of Cragg who was of course bound to pay them, and being executory, the relationship is insufficient as a consideration: 2 *Kent Com.* 466; 7 *Barr* 101. This as a consideration is rebutted by the proof of their mutual hostility. Her seal is but presumptive evidence of consideration: 1 *Dall.* 17; 1 *S. & R.* 438; 5 *ib.* 201; 8 *ib.* 178; 4 *Binn.* 4; so in New York, 2 *Rev. St.* 328; 11 *Wend.* 196. It was also revoked as is always competent in case of a mere voluntary executory promise or gift. An actual delivery is essential in all such cases to render the gift absolute: 2 *Bl. Com.* 441; 7 *Barr* 100; 2 *Gill. & J.* 209; 6 *Ves.* 662; *Prec. Ch.* 182; 12 *Ves.* 39; 1 *Bligh* 529; 2 *Stor. Eq.* sec. 906, 78, 433. But clearly to be entitled to the benefits he must have performed his agreement. The evidence shows he did not do so in part at least. This claim interferes with that of creditors, and it was made under a mistake, for the notes to counsel were merely signed by Elliott. They only show more clearly the want of consideration and cannot be used to explain the written certificate: 3 *Barr* 37; 1 *Binn.* 37; 2 *Barr* 80.

*Markland,* contra, argued that the court had not jurisdiction to grant the relief, and that there was an adequate remedy at law. It is well settled here that payment by a surety will not extinguish the security: 1 *W. & S.* 157; much more so when there is an express stipulation that the right shall pass to another. The relationship was a sufficient consideration, but the seal does not merely import a consideration, but stands in lieu of it: *Bac. Ab. T. Agreement, B.* 2; 1 *J. C. R.* 329; 1 *S. & R.* 408; and then equity will not relieve against volunteers but for fraud: 1 *Bac. Ab.* 166; 1 *Atk.* 401; 2 *Har. & Gill.* 641.

The opinion of the court was delivered by

BELL, J.—The prayer of the plaintiff's bill is that the defendant, Patton, shall be compelled to deliver up the bond and mortgage, and enter satisfaction on the record thereof; that the articles of July 12, 1837, be surrendered for cancellation; and that the defendants be restrained, by perpetual injunction, from suing, at law, the bond and mortgage executed by the testator.

[Yard *v.* Patton.]

A preliminary objection is taken, by the defendants, to the jurisdiction of the court; but as we are against the plaintiff on the merits, as disclosed by the pleading and evidence, it is unnecessary directly to decide the question of power. For myself, however, I may be permitted to express my strong inclination to give a liberal construction to the several acts of assembly conferring equity jurisdiction upon our common law courts, as the exercise of this jurisdiction is found to be necessary to the furtherance of justice in a large variety of instances, in which the principles and practice of the courts of law fail to afford adequate relief. Acting upon this inclination, which, I believe, is entertained by all the judges of this court, I think it might be easily shown the pending application falls within the provisions of the statutes relating to this subject, and that, in a proper case, the court is invested with power to afford the relief prayed for here.

That prayer, in effect, calls upon the court to exercise its authority in revocation of the agreement of July, 1837; thus invoking its action, not to enforce the specific performance of a contract, but to decree its destruction. Now, nothing is better ascertained than the distinction which works a practical difference between a chancellor's interference for the purposes of execution, and the exertion of his authority in avoidance of an undertaking legally valid. He may refuse to lend his assistance to consummate an unconscionable bargain, accompanied by circumstances of suspicion, though not positively unfair; yet it by no means follows that hardship, or even suspicion of unfairness, is always potent enough to move him to action; and it has been truly and forcibly said, a consequence of this distinction is, that though equity will refuse to interfere to execute wherever it would revoke, it may refuse to revoke where it would decline to execute. Delamater's Estate, 1 *Wh.* 374. The cases in which this peculiar jurisdiction is properly exercised are said, by the same authority, to be reducible to one of the four heads of fraud, mistake, turpitude of consideration, and circumstances entitling to relief upon the principle of *quia timet;* and each of these should be established by positive and definite proof. It has not been urged that the case presented by the plaintiff is embraced by the last mentioned division; and we are, consequently, confined to the inquiry, whether he has exhibited any evidence which sufficiently brings it under either of the three preceding heads?

This question, we are of opinion, admits of ready answer. Though the complainant's bill suggests that the agreement of the 12th of July, which constitutes the *defendant's*, Rose Cragg's, title to the mortgage in controversy, was unfairly obtained from Elliott, while laboring under some mistake or misapprehension of his rights, and the duties he owed to himself and his son-in-law, we find nothing in the proofs laid before us positively establishing

such an averment.  On the contrary, all the evidence tends to show the absence of unfair dealings, and to work the conviction that the agreement of July was the result of a deliberate arrangement previously made between Elliott and Cragg, with a full knowledge of their respective liabilities, and a perfect cognizance of what was, legally and morally, due from each to the other.  If it be urged that the mere fact of conceding to Cragg a beneficial interest in the mortgage, on the condition of discharging his own debts, evidences the existence of some mistake, or necessarily leads to the suspicion of practiced fraud, a satisfactory response may, perhaps, be found in the relation they occupied, of father-in-law, and husband of an only child, the mother of children, whose welfare was then a consideration of paramount importance, in the view of the parent and grandfather, therefore, willing, in anticipation, to appropriate a portion of the estate which would be theirs, on his decease, to their advancement during his life. But waiving considerations such as this, it is sufficient to observe that a bare possibility of mistake or suspicion of fraud is, as before already shown, ineffectual to awake to action the extraordinary power of recision invoked by the plaintiff.  A refusal to interpose but refers the parties to their rights and remedies at law; and a consequence of this is that distinctness and certainty, not only in allegation, but in proofs, is an imperative prerequisite to equitable interposition.  In warrant of the conclusion I have already intimated, a brief review of the circumstances attending the transaction may not be altogether unprofitable.

The indenture executed between Elliott and Patton, declaring the trusts upon which the bond and mortgage were held by the latter, bears date the 30th of June, 1837.  But prior to this, on the first of that month, we find that Elliott was in correspondence with Mr. Brown, who appears to have been his legal adviser, in reference to some important business about to be transacted. After this came the note of June 20th, by which Elliott requested Brown to prepare an instrument of writing, declaring the propositions and arrangements Cragg had or might make with the banks, (doubtless in respect to the notes endorsed by Elliott,) and suggesting that he would call, personally, on Mr. Brown in a few days.  The next step, so far as we are informed, was the execution of the mortgage and accompanying agreement by Elliott and Patton; and this was followed, on the 3d of July, by a note from Mr. Brown to his then client, Elliott, in which is stated the understanding entertained by the former, of the terms and conditions upon which Cragg was to take an interest in the mortgage.  This correspondence clearly indicates a prior negotiation between, and a conclusion arrived at by, Elliott and Cragg, which had been communicated to Mr. Brown, with the intent of having it put in a formal and binding shape.  Upon the letter is an endorsement,

[Yard *v.* Patton.]

evidently made under Elliott's direction, stating the fact that he
had answered it on the 5th of July, by requesting Mr. Brown's
particular attention to the proposed article of agreement between
Cragg and Elliott.    This answer is, also, in proof; and by it the
writer anxiously urged Mr. Brown to prepare the proposed agree-
ment at once, and to be very particular in binding Cragg to meet
the proposition he had made, referring to the new notes he, Elliott,
was to give in pursuance of it.    As, however, it did not distinctly
respond to the queries put in Mr. Brown's prior note, as to the
terms on which Cragg was to have the mortgage, in consequence
of which the counsel could not, understandingly, prepare the pro-
posed instrument, he returned to Elliott his letter, with a note
indorsed, inquiring whether Cragg was to have the benefit of the
mortgage if he paid the ten per cent. reduction, and added: "If
that is your wish, then I shall know how to draw the agreement.
Let me have your answer on this note."    An answer was accord-
ingly sent, couched in these few, but emphatic words: "I wish
you to draw up the article according to the ideas conveyed in your
note of the 3d instant;" and then, on the 12th of July, the agree-
ment, doubtless drafted by Mr. Brown, as the counsel of Mr. El-
liott, was formally executed by Elliott and Cragg, and on the next
day duly acknowledged by the parties, before an alderman of this
city.    It is to be observed that, up to this time, Elliott appears to
have been the principal actor in consummating the arrangement
made between him and his son-in-law.    Manifesting a strong de-
sire effectually to bind Cragg to the performance of his proposi-
tion to assume payment of the debts mentioned in the mortgage,
he urged the speedy preparation and completion of the agreement
now proposed to be revoked, and was evidently restless and uneasy
until this object was attained.    These facts, in connection with the
other circumstances, strongly recommend the adoption of the de-
fendant's averment, that Elliott, in order to advance his son-in-
law in business, had before agreed to assist him by a donation to
the amount of the notes indorsed by him; and that the subsequent
arrangement was entered upon by Cragg, at Elliott's solicitation,
in order to relieve present embarrassments, flowing from his pre-
ceding engagements.    At all events, the review of the transaction,
in connection with the *res gesta*, almost, if not entirely, leaves the
inquirer free of doubt that both the parties perfectly understood
what they were doing, and acted free of any influence springing
from falsehood, fraud or misapprehension.    Indeed, the idea of
unfairness or mistake was not urged with much emphasis; and
this is, questionless, to be ascribed to the want of a basis upon
which to build such an argument.

But the validity of the agreement in dispute is principally as-
sailed for alleged want of consideration.    To make this objection
available, it is insisted the contract was executory, and being

[Yard *v.* Patton.]

purely voluntary, was revocable at the mere will of Elliott.    But
one answer to this position is that the seals of the parties in them-
selves import a consideration and save their covenants from fall-
ing within the class of nude facts at law and in equity: Bunn *vs.*
Winthrop, 1 *Johns. Ch.* 329; 1 *Bou. Bac. Ab.* 165, *F. Agree-
ment, Let. B.* 21; and it is not now to be doubted that though a
parol, unexecuted promise to make a gift *inter vivos* without con-
sideration is void, an agreement under seal to do so may be en-
forced as a legal obligation: In re Campbell's Estate, 7 *Barr* 100.
Nor, as argued for the plaintiff, is the presence of a seal only
presumptive evidence of consideration in Pennsylvania.    It is
true that where an actual valuable consideration is intended to
pass, and furnishes the motive for entering into a contract, a
party may defeat it by showing a failure of consideration, at any
time before its final execution.    Upon this equity are founded the
cases of Steinhause *vs.* Witman, 1 *S. & R.* 438; Hart *vs.* Porter,
5 *S. & R.* 201; Hessner *vs.* Helm, 8 *S. & R.* 178, cited for the
plaintiff, and other kindred cases; but the doctrine has no appli-
cation where the contracting parties do not contemplate the ac-
tual presence of valuable consideration, and it seems to be certain
that equity will not relieve against an instrument under seal,
merely on the ground of want of consideration.    Indeed, it is
said that it will interpose against volunteers, only where there is
fraud: 1 *Bou. Bac. Ab.* 166, Morris *vs.* Burroughs, 1 *Atk.* 401,
for, the equities being equal, the volunteer having the law shall
prevail, Black *vs.* Cord, 2 *Harr. & Gill* 103, a principle which has
been applied even in protection of a common prostitute, to whom
a voluntary bond was given, Hill *vs.* Spencer, *Amb.* 641.

Again, it is affirmed to be against rule that courts of equity
will not interfere to carry into effect unexecuted voluntary con-
tracts, *inter vivos*, but will leave the parties to their remedies at
law.    And this in the absence of fraud or mistake, is the extent
to which the principle is carried, for the doctrine is to be under-
stood with the qualification that although chancery will withhold
its aid to consummate a voluntary agreement, unexecuted, where
something remains to be done by the contracting parties, yet
where it is executed, equity will give effect to all its consequences:
1 *Story's Eq.* 433, *N.* 3.    In such a case a consideration is un-
necessary: Delamater's Estate, 1 *Wh.* 375.    Upon this distinc-
tion rests the determination in Pennington *vs.* Getting, 2 *Gill &
John.* 209, where the court refused to give effect to an intended
gift, by a parent to a child, of certain bank stock, of which the
certificate was handed to the contemplated donee, but no transfer
of it was made on the books of the bank, which was the only re-
cognized mode of passing an interest in the shares; of Duffield
*vs.* Elwees, 1 *Bligh R.* 529, where the Master of the Rolls refus-
ed to compel an executor to complete a proposed donation, *inter*

*vivos*, left unperfected by his testator; and of Fortesque *vs.* Barrett, 3 *Mylne & Keen* 36, which decides that the voluntary assignment of a bond or policy of life insurance under seal, will operate to transfer the property in the bond or policy, though these were never actually delivered to the assignee. The last decision proceeds on the ground that the assignment operated to transfer the bond, and consequently, nothing remained to be done to execute the intent of the parties. Is not the principle of this case applicable here? Nothing remained to be done on the part of Elliott, to perfect his agreement. Did not the instrument of July operate a transfer of the mortgage, immediately upon performance of the stipulated conditions by Cragg, or as between him and Elliott, as soon as the latter interfered to prevent performance, after which he could not recall his agreement? If this be so, and Cragg or his assignee were here asking us to decree an assignment of the mortgage, he would be entitled to our aid, though the covenants of July should be regarded as purely voluntary.

But are they so? I am inclined to think they are not. Even supposing the original notes were endorsed for the accommodation of Cragg, with the purpose of advancing him by a donation of a portion of his father-in-law's estate, his undertaking to assume upon himself the liabilities imposed by Elliott's agreement with Patton, amounted to a consideration. True, he was legally bound for the payment of his own debts, but he was not compellable to discharge them in the manner and time stipulated by that agreement. Now, it is not to be disputed that if one at the request of another, assume to do a thing he is not compellable in law to do, from which that other derives a benefit, this will constitute a good consideration, and its mere inadequacy, compared with the benefits to be derived by the performing party, will not affect the validity of the contract.

But the plaintiff further objects that the debts, to secure the payment of which the bond and mortgage were executed, having been paid, these instruments must be treated as *functus officio.*— Were this even so, I doubt whether it would afford ground for administering the remedy prayed here. But, waiving this, a little examination will demonstrate the objection is untenable. It is founded upon the modern doctrine of the English Chancery, adopted by Mr. Justice STORY, in his treatise upon Equity Jurisdiction, which denies to a paying surety the use of the instrument taken to secure the debt paid, upon the technical notion that payment extinguishes the instrument, and so renders it worthless for every purpose. But this supposed effect of payment has never been recognized in Pennsylvania. On the contrary, we have expressly repudiated it, as may be seen by consulting Fleming *vs.* Beaver, 2 *R.* 128; Croft *vs.* Moore, 9 *W.* 451;

Morris *vs.* Oakford, 9 *Barr* 498, and numerous other precedents, agreeing in this particular with the New York determinations of Cheesebrough *vs.* Millard, 1 *John. Ch.* 413, and Avery *vs.* Petten 7 *John Ch.* 211, which rule that a surety who has paid the debt is entitled to an assignment of the security against his principal or co-surety.    Were our rule, however, in harmony with that which obtains in England, it would not help the plaintiff.  I think it is impossible to examine the transaction before us without adopting the conviction that the several agreements originated at the same time, and were intended to be simultaneous; the contract executed between Elliott and Cragg being temporarily postponed from some difficulty in arranging its details or in reducing them to form in writing.    If so, it is obvious that the mortgage was executed for the double purpose of securing payment of the notes and conferring a benefit upon Cragg, in the event of payment by him of the original debts.    This would prevent an application of the rule of extinguishment, did it exist in this State, though Patton, the mortgagor, was no party to that agreement. He is, in truth, but a mere trustee, holding the securities in subservience to the agreements of the parties, namely: first, for the use of the note-holders; and secondly, for the benefit of whoever might, afterwards, be entitled to them.    And the result would be the same, if the agreement between Elliott and Cragg was the fruit of an after-thought, for we cannot doubt the competency of the mortgagor to stipulate that after payment of the notes the mortgage should continue to exist for the benefit of a third person.

It is further urged that Cragg failed to comply with his contract, and thereby lost whatever benefit he would otherwise have been entitled to under it.    But it is in full proof that his partial failure was caused by the bad faith of the other contracting party, who sought to make his own breach a ground for invalidating the agreement.    This was a fraud upon his contract, and falls within the maxim, that no man shall be permitted to take advantage of his own wrong.

Besides, Cragg's default may be pecuniarily compensated, and therefore cannot be used to defeat, *in toto*, his interest in the mortgage.    It operates to affect it only *pro tanto.*

Another objection is, that the contract of July is in violation of the rights of Elliott's creditors, and therefore void.    But these creditors are not before the court; nor have we the means of ascertaining whether the remaining portion of Elliott's estate is insufficient for the payment of his debts.    Even then, conceding the contract to be purely voluntary, and void against creditors, there is no pretence for so declaring it, until, at least, the plaintiff shows the insolvency of his testator's estate.

I have, I believe, noticed all the grounds upon which the plaintiff's prayer for relief has been pressed, and find none of them of

[Yard *v.* Patton.]

sufficient force to warrant our interposition in the manner asked. Perhaps it would have been enough to have rested our refusal upon the single principle conceded by the plaintiff's counsel, in his argument, that, "in respect to voluntary contracts, *inter vivos*, courts of equity will not interfere, but will leave the parties where the law finds them." 2 *Story's Eq. Jur.* 433.

Decree at Nisi Prius, dismissing the bill with costs, affirmed.